UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

K.G., INDIVIDUALLY AND ON          :
BEHALF OF C.G., A MINOR,           :
                    Plaintiff,     :
                                   :
     v.                            :          CA 09-299 ML
                                   :
KENNETH M. SHEEHAN, WEST           :
WARWICK SUPERINTENDENT OF          :
SCHOOLS; MALCOLM A. MOORE,         :
WEST WARWICK FINANCE DIRECTOR;     :
LINDAGAY PALAZZO, BRUCE VANASSE,   :
ELIZABETH BRUNERO, JAMES A.        :
WILLIAMSON, JR.; AND JOHN          :
PETTINICCHIO, JR., IN THEIR        :
CAPACITY AS MEMBERS OF THE         :
WEST WARWICK SCHOOL COMMITTEE,     :
                    Defendants.    :

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

      Before the Court are cross motions for summary judgment:

West Warwick's Motion for Summary Judgment (Docket ("Dkt.") #11)

and Plaintiff['s] Motion for Summary Judgment (Dkt. #14)

(collectively the "Motions").  Plaintiff K.G. ("Plaintiff" or

"Parent"), on behalf of C.G., a minor ("C.G." or the "Student"),

seeks judicial review of a decision by an impartial due process

hearing officer which found that West Warwick offered C.G. a

"free appropriate public education ["FAPE"]," 20 U.S.C. §

1412(a)(1)(A),[1] in the least restrictive environment in

_____

      [1] The Individuals with Disabilities Education Act ("IDEA" or
"Act"), 20 U.S.C. §§ 1400-1487, guarantees disabled children between
the ages of three and twenty-one access to a "free appropriate public
education ["FAPE"]," id. § 1412(a)(1)(A); see also id. §

accordance with federal and state law.  <u>See</u> Complaint (Dkt. #1)

¶¶ 1, 13; <u>see also</u> <u>id.</u>, Exhibit ("Ex.") A (Impartial Due Process

Hearing Officer's Decision ("Decision")).

This matter has been referred to me for preliminary review,

findings, and recommended disposition pursuant to 28 U.S.C. §

636(b)(1)(B).  A hearing was held on August 20, 2010.  For the

reasons stated below, I recommend that West Warwick's Motion for

Summary Judgment be granted and that Plaintiff's Motion for

Summary Judgment be denied.

## I.  Facts[2]

---

1400(d)(1)(A).  "[T]he 'free appropriate public education' ordained by
the Act requires participating states to provide, at public expense,
instruction and support services sufficient 'to permit the child to
benefit educationally from that instruction.'"  <u>Roland M. v. Concord
Sch. Comm.</u>, 910 F.2d 983, 987 (1st Cir. 1990)(quoting <u>Bd. of Educ. of
Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley</u>, 458
U.S. 176, 203, 102 S.Ct. 3034 (1982)).

[2] Neither Plaintiff nor Defendants submitted a separate Statement
of Undisputed Facts as required by District of Rhode Island Local Rule
56(a), which provides, in relevant part, that:

(1) In addition to the memorandum of law required by LR Cv 7,
a motion for summary judgment shall be accompanied by a
separate Statement of Undisputed Facts that concisely sets
forth all facts that the movant contends are undisputed and
entitle the movant to judgment as a matter of law.

(2) The Statement of Undisputed Facts shall be filed as a
separate document with the motion and memorandum. Each "fact"
shall be set forth in a separate, numbered paragraph and shall
identify the evidence establishing that fact, including the
page and line of any document to which reference is made,
unless opposing counsel has expressly acknowledged that the
fact is undisputed.

....

DRI LR Cv 56(a).  Accordingly, the facts are taken from the Complaint,

Plaintiff is the mother and natural guardian of C.G., a minor. Complaint ¶ 2. They reside in West Warwick, Rhode Island. Id. Defendant Kenneth M. Sheehan is the Superintendent of Schools for the Town of West Warwick; Defendant Malcolm A. Moore is the Finance Director for the Town of West Warwick; and Defendants Lindagay Palazzo, Bruce Vanasse, Elizabeth Bruneto, James A. Williamson, Jr., and John Pettinicchio, Jr., are members of the West Warwick School Committee (collectively "Defendants" or "West Warwick"). Id. ¶¶ 3-5.

At all times relevant hereto, C.G. was eligible for special education as that term is defined in 20 U.S.C. § 1401(29). Id. ¶ 6. At the time of the due process hearing, she was seventeen years old and enrolled in the tenth grade at the Tides School, a private facility, in which she had been unilaterally placed by Plaintiff on September 4, 2007. Decision at 9.

In January of 2006 C.G., then in the eighth grade at Deering Middle School ("Deering") in West Warwick school district ("the District"), see Decision at 9; see also Plaintiff's Hearing Ex.[3] P-4 (Team Review of Referral and Evaluation Report), revealed to Plaintiff that she had been sexually abused over a two year

the exhibits and transcripts from the hearings before the impartial due process hearing officer ("Hearing Officer"), and the Hearing Officer's decision, see Complaint, Exhibit ("Ex.") A (Impartial Due Process Hearing Officer's Decision ("Decision")).

[3] "Hearing Ex." refers to exhibits submitted during the administrative proceedings before the Hearing Officer.

period by a family friend, Decision at 10 (citing Transcript of March 9, 2009, hearing ("Tr. Vol. V") at 9). The assailant worked for the District as a referee in after school sports programs, came to the middle and high school campus[4] once or twice a week during basketball season, and was friendly with C.G.'s social studies teacher, Michael Francois. Id. (citing Transcript of February 26, 2009, hearing ("Tr. Vol. I") at 72-79); see also Tr. Vol. I at 71-72. After the disclosure, the assailant was barred from the middle and high schools and campus. Decision at 10 (citing Tr. Vol. I at 80).

After the disclosure of the sexual abuse, C.G.'s attendance and grades began to worsen. Decision at 10 (citing Transcript of March 3, 2009, hearing ("Tr. Vol. II") at 13-16). Plaintiff expressed concern regarding the effect of the disclosure on C.G., with respect to teacher attitudes toward her, to C.G.'s guidance counselor, Susan Patalano. Decision at 10. Ms. Patalano arranged a meeting of Plaintiff, C.G., and C.G.'s teachers for the purpose of making C.G. feel comfortable at the school. Id. (citing Tr. Vol. II at 22). The staff was supportive of C.G. and encouraged her to remain in school, but Plaintiff did not feel that Mr. Francois was supportive and was still concerned about his attitude toward C.G. Id. (citing Tr. Vol. II at 24).

---

[4] Apparently Deering Middle School ("Deering") and West Warwick High School ("WWHS") share a campus. See Decision at 10.

Although Mr. Francois expressed disappointment in the assailant, he stated that he was a professional and would perform his job as C.G.'s teacher and treat C.G. like any of his other students. See id. (citing Tr. Vol. I at 80; Tr. Vol. II at 24).

At approximately the same time as the aforementioned meeting, Plaintiff spoke with the Superintendent of the District's public schools, David Raiche, and expressed her wish to have C.G. attend school outside the District. Id. at 10-11. Coventry High School ("Coventry") was mentioned, and Mr. Raiche offered to call Coventry to "see what he could do." Id. at 11 (citing Tr. Vol. V at 23). He then notified Ms. Patalano that he was arranging a placement in Coventry for C.G. Id. (citing Tr. Vol. II at 25). Ms. Patalano did not agree that transferring to Coventry was best for C.G. and felt that C.G. could still benefit from staying in the District. Id. (citing Tr. Vol. II at 26-28). She expressed her views to Plaintiff, who agreed that C.G. would remain in the District. Id. (citing Tr. Vol. V at 23).

Following the events described above, in March of 2006 C.G. was referred to the West Warwick Special Education Department for evaluation. Id. at 9, 11; see also Plaintiff's Hearing Ex. P-4. She was subsequently evaluated by the Eligibility Team and on April 27, 2006, the Eligibility Team met to review the results. Decision at 9; see also Plaintiff's Hearing Ex. P-4. C.G. was found to be eligible for special education services. Decision at

9; see also Plaintiff's Hearing Ex. P-6 (IEP dated 5/1/06 ("5/1/06 IEP")).  The Eligibility Team determined that C.G.'s primary disability was emotional disturbance at the time, but that she also had needs in the academic areas of reading and mathematics.  Decision at 9; see also Plaintiff's Hearing Ex. P-4.  An IEP meeting was conducted on May 1, 2006 (the "5/1/06 meeting"), which resulted in the 5/1/06 IEP which continued regular grade placement, with social intervention services and academic support to be provided by a special education teacher in concert with others.  Decision at 9; see also Plaintiff's Hearing Ex. P-6.

C.G. was promoted to West Warwick High School (WWHS") in September, 2006, and the 5/1/06 IEP was still in effect. Decision at 11 (citing Tr. Vol. II at 35).  However, problems began to emerge with truancy, cutting classes, leaving school with a friend, and negative peer pressure.  Decision at 11 (citing Tr. Vol. II at 37).  The IEP team, including Plaintiff, met on September 28, 2006 (the "9/28/06 meeting"), to discuss these problems and review C.G.'s IEP.  Id. (citing Plaintiff's Hearing Ex. P-33 (WWHS Meeting Minutes of 9/28/06 meeting)). Plaintiff indicated that there were problems at home as well. Id. (citing Tr. Vol. II at 39).  A wayward petition had been filed in Family Court by C.G.'s parents, but no court date had been scheduled.  Id.  The IEP team reviewed C.G.'s program; noted

that C.G. lacked social skills and had academic problems with comprehension, English, History, and reading; and that C.G. felt stressed and "didn't care." Id. The IEP team listed activities in which C.G. was interested and follow-up tasks, i.e., to contact social intervention, to suggest that teachers redirect C.G. and use more verbal cues, possibly to involve Ms. Patalano, and to add more goals to the IEP. Id. (citing Plaintiff's Hearing Ex. P-33).

As a result of the wayward petition, the Family Court ordered a fourteen-day residential evaluation to be completed by Residential Diagnostic Assessment Services, through the Department for Children, Youth, and Families ("DCYF"). Id.; see also Plaintiff's Hearing Ex. P-9 (Residential Diagnostic Assessment Services report dated 12/2/06 ("DAS Report" or "DAS Evaluation")). A report was completed on December 2, 2006. Id.; see also DAS Report. The DAS Report included diagnoses indicating marked emotional problems and impulsivity,[5] demonstrating poor insight and judgment, attentional issues,[6] parent-child relational problems, educational problems, sexual abuse, and borderline intellectual functioning. Decision at 12;

_____

[5] Specifically, C.G. was diagnosed with major depressive disorder by prior history. See Plaintiff's Hearing Ex. P-9 (Residential Diagnostic Assessment Services report dated 12/2/06 ("DAS Report" or "DAS Evaluation")) at 11.

[6] C.G. was diagnosed with attention-deficit/hyperactivity disorder ("ADHD"), combined type, again by prior history. See DAS report at 11.

see also DAS Report at 11. The DAS report also included recommendations regarding placement (at home with her family); psychiatric evaluation (to continue to be followed by her psychiatrist, Dr. Tarnoff); psychotherapy (individual therapy); home-based family counseling; and educational planning (to continue to follow her IEP but also to consider the possibility of placing her in a self-contained classroom, a mainstreamed classroom with more academic support, or an alternative placement). Decision at 12; see also DAS Report at 12-13. The DAS report was not authorized to be released without Family Court approval. Decision at 12; see also DAS Report at 1. It was not made available to West Warwick or the IEP team until June, 2007. Decision at 12.

By February of 2007, C.G. had become disengaged from school, with forty absences, sixteen of which were unexcused. Id. (citing Transcript of March 4, 2009, hearing ("Tr. Vol. III") at 17). The IEP team met on February 14, 2007 (the "2/14/07 meeting"), to review C.G.'s IEP and develop a new IEP. Id. The IEP team felt that C.G. needed to be in a small group setting, where she could receive one-to-one special education instruction, take special transportation, and avoid going through the corridors of WWHS. Id. This would be accomplished by placing C.G. in an after school alternative program for two hours a day, five days a week. Id. Summer tutoring for credit could also be

available.  Id.  A new goal of re-engaging C.G. in school was established.  Id. at 13 (citing Tr. Vol. II at 44-57; Parent's Hearing Ex. P-10).  Although both Plaintiff and C.G. indicated that they wanted a change in placement (i.e., high school) due to C.G.'s personal issues, id., Plaintiff signed the IEP dated February 14, 2007 (the "2/14/07 IEP"), see 2/14/07 IEP at 7.

On May 14, 2007, the IEP team met again (the "5/14/07 meeting") to review C.G.'s IEP.  Plaintiff presented a formal, written request for a change of high schools at this meeting. Decision at 13; see also Plaintiff's Hearing Ex. P-41 (Letter from Plaintiff to IEP Team for C.G. of 5/4/07 ("5/4/07 Letter")). Plaintiff reasoned that C.G. felt uncomfortable being in a place where her situation was well-known and that C.G. needed to be in an appropriate educational setting.  Decision at 13 (citing Parent's Hearing Ex. P-41).  C.G.'s case manager and special education teacher, Brenda DeLouise, did not agree with the request to change schools, see id. (citing Tr. Vol. II at 74), but Plaintiff indicated that she did not want C.G. at WWHS, no matter what program existed, id. (citing Parent's Hearing Ex. P-35 (Minutes of 5/14/07 meeting))).  The team agreed that this issue needed to be addressed, id. (citing Tr. Vol. II at 64), and indicated that information would be given to Plaintiff regarding a new program (known as the Civic Center program) apart from WWHS as well as visits to other schools, id. (citing Parent's Hearing

Ex. P-13 (IEP dated May 14, 2007 ("5/14/07 IEP")).  The IEP team
also discussed a summer tutoring program for Plaintiff and
recommended that C.G. complete the school year in the after
school alternative program at WWHS.  Id. (citing Parent's Hearing
Ex. P-13).  On the advice of her educational advocate, Michael
Capalbo, Plaintiff agreed to this placement and signed the
5/14/07 IEP.  Id. (citing Transcript of March 30, 2009, hearing
("Tr. Vol. IX") at 78; Parent's Hearing Ex. P-13); see also
Parent's Hearing Ex. P-13 at 7.

Because the 5/14/07 IEP expired on June 19, 2007, the IEP
team met again on June 1, 2007 (the "6/1/07 meeting", to discuss
C.G.'s placement for the tenth grade.  Decision at 13-14 (citing
Parent's Hearing Ex. P-35).  At this time, Plaintiff indicated
her satisfaction with the Coventry Life Skills program, which she
had visited.  Id. at 14 (citing Tr. Vol. II at 82).  Mr. Capalbo,
as well as a number of employees of Tides Family Services
("Tides"), attended this meeting.  Id.  Mr. Capalbo wanted to
have a vote in order to make a decision on C.G.'s placement, id.
(citing Transcript of March 10, 2009, hearing ("Tr. Vol. VI")) at
46, while the West Warwick staff present felt that more
information was needed, particularly from the DAS Report which
had just been made available to the IEP team but which they had
not yet reviewed, id. (citing Tr. Vol. II at 86).  The meeting
adjourned without an IEP being signed, see Parent's Hearing Ex.

P-14 (Minutes of 6/1/07 IEP meeting) and it was agreed that the team would meet again on June 6, 2007, to review the DAS Report and to continue discussing C.G.'s placement for the tenth grade, see Decision at 14.

On June 6, 2007, the IEP team reconvened (the "6/6/07 meeting") and discussed the DAS Report. Id. The Tides representatives, including Mr. Capalbo, indicated that they were in agreement with a placement at Coventry as they wanted a school setting outside the District. Id. Brian Dillon, the Associate Principal of WWHS and the administrative representative on the IEP team, described the Civic Center program, which included clinical services, small classes, and a location separate from the WWHS building. Id. Plaintiff, however, still wanted C.G. in a different setting. Id. (citing Parent's Hearing Ex. P-15). The 6/6/07 meeting ended at an impasse, with no agreement on placement and an incomplete IEP. Id.

Paul Vigeant, Director of Special Education for the District, see Transcript of March 5, 2009, hearing ("Tr. Vol IV") at 99, sent Plaintiff a letter on August 8, 2007 (the "8/8/07 Letter"), informing her that an IEP meeting had been scheduled for August 17, 2007 (the "8/17/07 meeting"), Decision at 14; see also Tr. Vol. VI at 88-89. Plaintiff denied receiving the letter. Decision at 14 (citing Tr. Vol. V at 54). The Special Education Clerk, Suzanne Paquette, who typed and mailed the

8/8/07 Letter, testified that on August 17, 2007, she received a telephone call from someone identifying herself as Plaintiff. Id.; see also Tr. Vol. VI at 86, 88-89. The person stated that her husband had been called in to work and could not attend the IEP meeting scheduled for that day, but that she would like to tour the school (presumably referring to the Civic Center program). Tr. Vol. VI at 87; see also Decision at 14. Ms. Paquette gave the caller the number at WWHS to reach Mr. Dillon to tell him what she wanted to do. Tr. Vol. VI at 87. Ms. Paquette then typed a memorandum reflecting the conversation to be put in C.G.'s student file, as was her practice. Id. at 87-88. Plaintiff denied calling Ms. Paquette to cancel the 8/17/07 meeting. Decision at 14 (citing Tr. Vol. V at 55-56).

On the same date as the scheduled meeting, Plaintiff sent a letter to Mr. Vigeant, which he received on August 20, 2007, indicating that she did not accept the recommended placement at the Civic Center program, that she was withdrawing C.G. from the District, and that she intended to place C.G. in a private school program at the expense of the District. Id. at 14-15; see also Plaintiff's Hearing Ex. P-18 (Letter from Plaintiff to Vigeant of 8/17/07 ("8/17/07 Letter")). Plaintiff's reasons for taking this action were that C.G. felt uncomfortable attending WWHS because of the sexual abuse situation and that C.G.'s school problems had increased due to the placement in the after school alternative

program, which Plaintiff felt was inappropriate.  Decision at 15;
see also 8/17/07 Letter.  C.G. began attending the Tides School
on September 4, 2007.  Decision at 15 (citing Plaintiff's Hearing
Ex. P-29B (Invoices from Tides to Plaintiff)).

Mr. Vigeant sent Plaintiff a letter on September 14, 2007,
in which he indicated that the District would not accept
financial responsibility for Plaintiff's unilateral placement of
C.G. at the Tides School.  Id.; see also Plaintiff's Hearing Ex.
P-19 (Letter from Vigeant to Plaintiff of 9/14/07 (the "9/14/07
Letter")).  He further indicated that the District's offer to
place C.G. in the Civic Center program would address all of her
needs and provide her with FAPE and that, therefore, the District
had no obligation to fund the placement at the Tides School.
Decision at 15 (citing 9/14/07 Letter).  The 9/14/07 Letter
concluded by stating that a copy of Plaintiff's due process
rights was enclosed and that Plaintiff should contact Mr. Vigeant
if she wished to set up an IEP meeting.  Id.; see also
Plaintiff's Hearing Ex. P-19.

## II.  Travel

On or about January 8 or 9, 2009, Plaintiff filed a request
for an impartial due process hearing with the Rhode Island
Department of Education ("RIDE"), requesting that an impartial
hearing officer find that West Warwick had failed to offer C.G.
FAPE in the least restrictive environment for the 2007-08 and

2008-09 school years.  Complaint ¶ 10; Decision at 6.[7]  Hearing

Officer Gloria S. Feibish (the "Hearing Officer") was appointed

on January 9, 2009.  Decision at 6.  A pre-hearing conference was

scheduled by RIDE for February 9, 2009.  Id.  At that meeting,

the Hearing Officer was presented with a stipulation waiving the

requisite resolution meeting.  Id.

Hearings commenced before the Hearing Officer on or about

February 26, 2009, and concluded on or about April 13, 2009.

Complaint ¶ 11; Decision at 6; see also Tr. Vol. I; Tr. Vol. II;

Tr. Vol. III; Tr. Vol IV; Tr. Vol. V; Tr. Vol. VI; Transcript of

March 11, 2009, hearing ("Tr. Vol. VII"); Transcript of March 12,

2009, hearing ("Tr. Vol. VIII"); Tr. Vol. IX; Transcript of April

13, 2009, hearing ("Tr. Vol. X").  On or about June 15, 2009, the

Hearing Officer issued her Decision, finding that West Warwick

offered C.G. FAPE in the least restrictive environment in

accordance with the Individuals with Disabilities Education Act

("IDEA") and Rhode Island law.  Complaint ¶¶ 12-13; see also

Decision.

Plaintiff on July 13, 2009, filed her Complaint in this

Court.  See Dkt.  West Warwick's Answer to Plaintiff's Complaint

(Dkt. #4) ("Answer") was filed on August 31, 2009.  See id.  West

Warwick's Motion for Summary Judgment was filed on February 1,

---

[7] There are two pages labeled "6" in the Decision.  The Court's
references are to the first of these pages.

2010, see id., followed on March 10, 2010, by Plaintiffs' Motion for Summary Judgment, see id. A hearing on the Motions was held on August 20, 2010. See id. Thereafter, the Motions were taken under advisement.

## III.  Standard of Review

Although a party in an IDEA, 20 U.S.C. §§ 1400-1487, appeal may move for "summary judgment," the fact that a motion is so captioned does not mean that the court uses its normal summary judgment standard of review in which it examines whether genuine issues of material fact exist. See Browell v. Lemahieu, 127 F.Supp.2d 1117, 1120 (D. Haw. 2000). Rather, the Act provides that, when an action is brought in the District Court, the Court:

   (i)    shall receive the records of the administrative
          proceedings;

   (ii)   shall hear additional evidence at the request of
          a party; and

   (iii)  basing its decision on the preponderance of the
          evidence, shall grant such relief as the court
          determines is appropriate.

20 U.S.C. § 1415(i)(2)(C)(i)-(iii); see also T.B. v. Warwick Sch. Dep't, No. Civ.A. 01-122T, 2003 WL 22069432, at *6 (D.R.I. June 6, 2003). "[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist.,

15

Westchester Cnty. v. Rowley, 458 U.S. 176, 206, 102 S.Ct. 3034
(1982).  Due weight must be given to the state administrative
proceedings.  See id.; Abrahamson v. Hershman, 701 F.2d 223, 230
(1st Cir. 1983).

> Although the exact quantum of weight is subject to the
> district judge's exercise of informed discretion, see
> Hampton [Sch. Dist. v. Dobrowolski], 976 F.2d [48,] at 52
> [(1st Cir. 1992)]; G.D. v. Westmoreland Sch. Dist., 930
> F.2d 942, 946 (1st Cir. 1991), the judge is not at
> liberty either to turn a blind eye to administrative
> findings or to discard them without sound reason.  See
> Burlington [v. Dep't of Educ.], 736 F.2d [773,] at 792
> [(1st Cir. 1984), aff'd, 471 U.S. 359, 105 S.Ct. 1996
> (1985)]("The court, in recognition of the expertise of
> the administrative agency, must consider the findings
> carefully and endeavor to respond to the hearing
> officer's resolution of each material issue.").  In the
> end, the judicial function at the trial-court level is
> "one of involved oversight," Roland M. [v. Concord Sch.
> Comm.], 910 F.2d [983,] at 989 [(1st Cir. 1990)]; and in
> the course of that oversight, the persuasiveness of a
> particular administrative finding, or the lack thereof,
> is likely to tell the tale.

Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1087 (1st Cir. 1993).

In short, "the law contemplates an intermediate standard of
review on the trial-court level--a standard which, because it is
characterized by independence of judgment, requires a more
critical appraisal of the agency determination than clear-error
review entails, but which, nevertheless, falls well short of
complete de novo review."  Id. at 1086.  "[T]he procedural
protections provided by the administrative process would be
rendered meaningless if courts could simply substitute their own
preferences for the administrative officers' evaluations."  Kevin

G. v. Cranston Sch. Comm., 965 F.Supp. 261, 263 (D.R.I. 1997).

**IV.   Burden of Proof**

Plaintiff, as the complaining party, bears the burden of proving that the hearing officer's decision was wrong.  See Roland M. v. Concord Sch. Comm., 910 F.2d 983, 991 (1st Cir. 1990)(applying IDEA's predecessor, the Education of the Handicapped Act); see also Schaffer v. Weast, 546 U.S. 49, 56, 126 S.Ct. 528 (2005)("[T]he person who seeks court action should justify the request, which means that the plaintiffs bear the burdens on the elements in their claims."); id. at 57-58 (concluding in IDEA case that "[a]bsent some reason to believe that Congress intended otherwise ... the burden of persuasion lies where it usually falls, upon the party seeking relief."); id. at 56 (explaining meaning of "burden of proof" in IDEA case as "which party loses if the evidence is closely balanced"); Barnett v. Fairfax County Sch. Bd., 927 F.2d 146, 152 (4th Cir. 1991)("[T]he party challenging the hearing officer's decision properly bears the burden of proof in showing that the officer's decision was erroneous."); Town of Burlington v. Dep't of Educ. for Mass., 736 F.2d 773, 794 (1st Cir. 1984).

**V.   Discussion**

**A.   Hearing Officer's Decision**

The Hearing Officer found that West Warwick offered C.G. FAPE.  Decision at 2.  With regard to Plaintiff's procedural

arguments, the Hearing Officer found that: West Warwick
considered the DAS Evaluation when making a placement decision;
West Warwick considered giving C.G.'s Parent an opportunity to
visit other possible program sites, but was not obligated to do
so, and did not provide a letter of introduction; the IEP team
determined program placement based on an array of possible
placements on the continuum; West Warwick did not make the
placement decision prior to the IEP meeting; and West Warwick did
not refuse to make a placement change, so prior notice was not
required.  Id.  The Hearing Officer further found that West
Warwick's placement determination constituted the least
restrictive environment as related to the potential harmful
effects on C.G.  Id.  Finally, the Hearing Officer concluded that
Parent should not be reimbursed by West Warwick for her
unilateral placement of C.G. at the Tides School.  Id.

   **B. Challenges to Hearing Officer's Decision**

   **1. Whether Plaintiff Obstructed the IEP Process**

   The Hearing Officer stated that she was

    struck by the way the Parent, through her Educational
    Advocate, seemingly tried to manipulate the IEP
    development process, by inviting a large number of TIDES
    Staff who knew the Student, having, at the previous IEP
    meeting, urged a vote, guaranteeing a favorable outcome
    for the Parent's wishes.  It is[,] therefore, not
    surprising, although no vote was reported at this
    meeting, the same outcome occurred.  Further, it is
    apparent that the Parent had a single purpose from the
    time she first informed school staff of her daughter's
    sexual abuse by a family friend (in 2006), until June
    2007, by this time, reinforced by her Advocate, that the

only acceptable placement would be in a school out of the
district.  The Coventry H[igh] S[chool] class, suggested
by her Advocate, became the desired placement, whether or
not the rest of the IEP Team agreed.  Attorney Anderson[8]
cites the [C.G. v.] Five Town [Community School District,
513 F.3d 279 (1st Cir. 2008)] case to support his
argument that the development of an IEP was stymied by
the parents' refusal to cooperate fully in the
collaborative process, which is mandated by the
Regulations.  In this case, which has some similarities
to the instant matter, the student, who had emotional
difficulties, and who had an incomplete IEP, and where
the parents' single-minded refusal to consider any
placement for the student other than the placement they
wanted, constituted an unreasonable approach to the
collaborative process.  The Parent complained that [West
Warwick] did not consider their requests, but this
Hearing Officer finds they did consider the Parent's
requests, but always maintained that the Student's needs
could be met within the District.

This Hearing Officer also finds entirely credible, the
testimony of Ms[.] Paquette, the School Clerk, regarding
the notice of the 8/17/07 meeting, as well as the report
of the phone call cancelling the meeting.  This
[District] staff member had nothing to gain (or lose)
from her testimony. ...

Decision at 24-25 (internal citations omitted).  Thus, the

Hearing Officer found that Plaintiff obstructed the IEP process

by (a) "stacking" 6/1/07 meeting, (b) refusing to consider any

placement other than Coventry, and (c) cancelling the 8/17/07

meeting.  The Court agrees.

### a. "Stacking" the 6/1/07 Meeting

The Hearing Officer's finding of facts with regard to the

6/1/07 meeting and 6/6/07 meeting (which was a continuation of

_____

[8] Attorney Jon M. Anderson represented West Warwick before the
Hearing Officer and currently represents West Warwick in this Court.
See Decision at 2; Dkt.

the 6/1/07 meeting) is telling:

> The IEP Team met again on 6/1/07, at which time[] the
> Parent indicated her satisfaction with the Coventry H.S.
> Life Skills program, which she had visited.  The Team at
> this meeting included a preponderance of TIDES employees,
> including the Parent's advocate, Michael Capalbo, who
> wanted to have a vote in order to make a decision on the
> Student's immediate placement, preferably at Coventry
> H.S.  The District's staff present[] felt that more
> information was needed, particularly from the DAS
> Evaluation, which had just been made available to the
> Team, and which they had not yet reviewed.  The meeting
> ended, and it was agreed to meet again on 6/6/07, in
> order to review the DAS Evaluation, and to continue the
> discussion of a program placement for the 10th grade.
>
> The DAS Evaluation was reviewed and discussed at the IEP
> Team meeting of 6/6/07.  The TIDES representatives,
> including Michael Capalbo, again indicated they were in
> agreement with a placement at Coventry H.S., as they
> wanted a school setting for the Student outside of the
> District.  Mr. Dillon, the [District] Administrative
> representative on the team, described the new alternate
> special education program at the Civic Center, which
> included clinical services, small classes and was located
> in a separate building.  Although he indicated this was
> open to discussion, the Parent still wanted her daughter
> in a different setting.  The meeting ended at an impasse,
> with no agreement on placement, and an incomplete IEP.

Decision at 14 (internal citations omitted).

The situation in the <u>C.G. v. Five Town Community School
District</u>, mentioned by the Hearing Officer in her Decision, was
similar.  According to the <u>Five Town</u> court:

> The meeting was "very contentious."  The participants
> quickly reached an impasse: the parents insisted that
> A.S. be educated in a therapeutic residential setting,
> whereas the School District insisted that a non-
> residential public school placement could provide A.S.
> with an adequate and appropriate education.  The meeting
> ended abruptly when the parents announced that they had
> decided to send A.S. to the FL Chamberlain School (an
> out-of-state residential institution) and would seek

reimbursement for the costs incurred. The meeting never progressed to a discussion either of the IEP or of how to fill the gaps in it.

C.G. v. Five Town Cmty. Sch. Dist., 513 F.3d at 283 (internal citation omitted). The parents "memorialized their unilateral placement decision in a letter sent the following week to the School District." Id.

Here, the minutes of the 6/1/07 meeting reflect that the meeting was contentious. Parent's Hearing Ex. P-14 at 1-2. It was noted that Plaintiff was "very satisfied" with the Coventry program and "really liked" it. Id. at 2. It was further noted "Mom frustration, money issue?" Id. According to the minutes, Mr. Capalbo stated that the issue of C.G.'s "placement" was "on [the] table", id., and he called for a "vote," id. All of the Tides employees, who numbered four, including Mr. Capalbo, see id. at 1, and Plaintiff and C.G. "agree[d] to [a] change of placement," id. at 2, to Coventry, see id. The District staff present, Ms. Johnson, Mr. Dillon, and Ms. Young, wanted to review the DAS Report before making a determination regarding a change in C.G.'s placement. See id.

At the 6/6/07 meeting, which again included Mr. Capalbo and three other Tides employees, see Plaintiff's Hearing Ex. P-16 (School Team Conference Report dated 6/6/07) at 1, as well as a DCYF worker, see id., the DAS Report was discussed, see Plaintiff's Hearing Ex. P-15 (Summary of 6/6/07 meeting) at 1;

21

see also Plaintiff's Hearing Ex. P-16 at 2.  Possible placements,
including the Coventry program and a new program being developed
by the District at the Civic Center, were also discussed.  See
Plaintiff's Hearing Ex. P-15 at 1; Plaintiff's Hearing Ex. P-16
at 2.  The minutes reflect that Plaintiff was concerned because
the Civic Center program was new.  See Plaintiff's Hearing Ex. P-
15 at 2.  Mr. Capalbo was "still in agreement," id. at 1, with a
placement at Coventry, because, as noted in the minutes, "Tides,
Mom, DCYF want a different setting," id.  It was noted that "Mom
wants to know why [West Warwick] is not accommodating to [the]
Coventry program."  Id. at 2.  It can fairly be inferred that
this meeting was also contentious, as the participants were "not
in agreement," id., and the IEP was not signed, id.  In addition,
a letter signed by Plaintiff and dated June 4, 2007 (the "6/4/07
letter") was presented, id.; see also Defendants' Hearing Ex. D-4
(Authorization for Release of School Records), which

> authorize[d] the West Warwick School Department to
> release to Amy R. Tabor or her representative and HARDY
> TABOR & CHUDACOFF Attorneys at Law, all records collected
> by the West Warwick School Department pertaining to
> [C.G.], including those obtained from other sources and
> to communicate with Amy R. Tabor or her representative
> concerning said student.

Defendants' Hearing Ex. D-4; see also id. ("My representative at
HARDY TABOR & CHUDACOFF Attorneys at Law, shall have the right to
inspect, review, and obtain copies of all such records.").

It is clear from the foregoing that the Hearing Officer's

finding that Plaintiff "seemingly tried to manipulate the IEP development process ...," Decision at 24, by inviting large number of Tides staff and urging, through her advocate, Mr. Capalbo, a vote which would "guarantee[] a favorable outcome for the Parent's wishes," id., is supported by a preponderance of the evidence of record. "The development of an IEP is meant to be a collaborative project." C.G. v. Five Town Cmty. Sch. Dist., 513 F.3d at 285; see also id. at 288 ("Congress deliberately fashioned an interactive process for the development of IEPs."). "[I]f parents act unreasonably in the course of that process, they may be barred from reimbursement under the IDEA." Id. (citing 20 U.S.C. § 1412(a)(10)(C)(iii)(III)).

### b. Refusal to Consider Any Other Placement

The foregoing also illustrates the Hearing Officer's finding that Plaintiff "had a single purpose from the time she first informed school staff of her daughter's sexual abuse by a family friend (in 2006), until June 2007, by this time, reinforced by her Advocate, that the only acceptable placement would be in a school out of the district. The Coventry H[igh] S[chool] class, suggested by her Advocate, became the desired placement, whether or not the rest of the IEP Team agreed." Decision at 24. The record supports the Hearing Officer's finding.

The Hearing Officer summarized the events of 2006 as follows:

23

> At about the same time as the meeting [among Plaintiff, C.G., and C.G.'s teachers] occurred, the Parent spoke to Sup[erintendant] Raiche about the disclosure, and **expressed her wish to have her daughter go to a school outside of the district. Coventry H.S. was mentioned,** and the Sup[erintendant] offered to call Coventry to see what he could do. He then notified Susan Patalano that he was arranging a placement in Coventry for the Student. However, Ms[.] Patalano did not agree that it would be best for the Student, and that the Student could still benefit from staying in [the District]. She expressed her views to the Parent, who agreed that her daughter would remain in the ... district. Following the events described above, the Student was evaluated, found eligible for Special Education services and an IEP was developed on 5/1/06.

Decision at 10-11 (bold added)(internal citations omitted). The meeting among Plaintiff, C.G., and C.G.'s teachers occurred in the spring of 2006. Tr. Vol. II at 21-22. Ms. Patalano testified that prior to that meeting, Mr. Raiche had raised with her the possibility of C.G. going to school outside the District. Id. at 25-26. The DAS Report dated December 2, 2006, also reflects Plaintiff's desire to switch C.G. out of the District. Parent's Hearing Ex. P-9 at 8.

As noted by the Hearing Officer, C.G. had "bec[o]me disengaged from school by 2/07 ...." Decision at 12. The minutes of the 2/14/07 IEP meeting reflect that "Mom + [C.G.] want change of placement due to personal issues ...," Parent's Hearing Ex. P-10 at 8, because C.G. felt that "everyone knows her issues," id. This was despite the fact that the teacher about

whom Plaintiff and C.G. had the most concern, Mr. Francois,[9] did not teach at WWHS, so C.G. would have no contact with him. Decision at 17. The 2/14/07 IEP included a new goal of trying to re-engage C.G. in school. Decision at 13; Parent's Hearing Ex. P-10 at 1. It was also noted that C.G. needed emotional and academic supports and a smaller setting with a low teacher/ student ratio. Parent's Hearing Ex. P-10 at 1. Thus, C.G. was placed in the 1:45-3:45 alternative program, with a shortened school day, id. at 3, 8, and would work as close as possible to the curriculum, id. at 8.

The IEP team met again on May 14, 2007. Decision at 13; Parent's Hearing Ex. P-13. Prior to that date, Plaintiff had submitted a letter to C.G.'s IEP team requesting a change of high schools. Parent's Hearing Ex. P-41. Plaintiff noted that she had previously requested a change in schools due to "the situation involving [C.G.] that has led to a court case," id., and that "because the individual involved in this incident is well known at West Warwick High School, [C.G.] feels very uncomfortable attending this High School," id. Plaintiff indicated that "[c]ombining this situation with [C.G.]'s Diagnoses of a major depressive disorder leads me to be fear full

_____

[9] The Hearing Officer "found Mr. Francois to be credible when he testified that he is a professional and that he treated the Student as a professional, i.e., did not threat her any differently than any of his other students." Decision at 17.

[sic] for [C.G.]'s well being. I am concerned for her psychological well being as well as her need to be in an appropriate[] educational setting." <u>Id.</u> The 5/4/07 Letter concluded by stating:

> Thus, I am again requesting a change of High Schools. In this way [C.G.] will have the opportunity to attend a High School where the potential for any school staff knowing about her situation, or the individual involved[,] will be limited or non-existent and she will have an opportunity to participate in a school program that will be appropriate to her special needs.

<u>Id.</u>; <u>see also</u> Parent's Hearing Ex. P-13 at 1 (noting that "Parent is requesting a change of high schools per formal letter dated 5/4/07"). The notes of the 5/14/07 meeting reflect that information would be given to Plaintiff regarding informational visits to Coventry and Tollgate High School as well as regarding a new program at WWHS. Parent's Hearing Ex. P-13 at 1; <u>see also</u> Parent's Hearing Ex. P-35 (IEP Notification/Summary of Meeting dated 5/14/07) at 2. However, it was clear that "[n]o matter what programs exist ... Mom does not want [C.G.] at WWHS." Parent's Hearing Ex. P-35 at 2; <u>see also</u> <u>id.</u> at 3 ("No matter what programs exist at WWHS Mom wants a change of placement[.]"). In the meantime, C.G. remained in the alternative program at WWHS. <u>See</u> Plaintiff's Hearing Ex. P-13.

The Hearing Officer's description of the 6/1/07 meeting and 6/6/07 meeting has been quoted above. <u>See</u> Discussion section V. B. 1. a. <u>supra</u> at 20. The minutes of the 6/1/07 meeting

reflect that Plaintiff was "very satisfied" with the program at Coventry.  Plaintiff's Hearing Ex. P-14 at 2.  As previously discussed, Mr. Capalbo sought a "vote" on C.G.'s placement.  Id.; see also Discussion section V. B. 1. a. supra at 21.  It was further noted that the meeting adjourned without signing the 6/1/07 IEP.  Plaintiff's Hearing Ex. P-14 at 1.

The 6/6/07 meeting fared no better.  The Civic Center program was discussed, but Mr. Capalbo, along with Plaintiff, the other Tides staff present, and the DCYF worker, were "still in agreement," Plaintiff's Hearing Ex. P-15 at 1, with a placement at Coventry.  The minutes include the notation that "Mom wants to know why school is not accommodating to Coventry program."  Id. at 2; cf. Brougham v. Town of Yarmouth, 823 F.Supp. 9, 16 (D. Me. 1993)("It is clear that under the IDEA, parental preference alone cannot be the basis for compelling a school district to provide a certain educational plan for a handicapped child."); see also Shaw v. Dist. of Columbia, 238 F.Supp.2d 127, 139 (D.D.C. 2002) ("Although the IDEA guarantees a free appropriate education, it does not, however, provide that this education will be designed according to the parent's desires.").  The 6/6/07 meeting ended with the parties not in agreement, and the 6/6/07 IEP was not signed, see Parent's Hearing Ex. P-17 (6/6/07 IEP) at 7.

It is clear that as early as the spring of 2006 Plaintiff had decided that C.G. would not go to WWHS, whether in the

regular education program, the alternative program, or the Civic Center program. See C.G. v. Five Town Cmty. Sch. Dist., 513 F.3d at 287 (noting that the district court "found that the parents harbored a fixed purpose: to effect a residential placement for their daughter at the School District's expense, come what may"). It is equally clear that Plaintiff, her advocate, Mr. Capalbo, and the Tides staff were not open to consideration of the Civic Center program. Cf. id. ("Once the parents realized that the School District was focused on a non-residential placement, they essentially lost interest in the IEP process."); see also id. (noting that this finding "supported an inference of parental obstruction"). Thus, no progress was made at either the 6/1/07 meeting or the 6/6/07 meeting due to Plaintiff's intransigence, and, as a result, the 6/6/07 IEP remained unsigned.

### c. Cancellation of 8/17/07 Meeting

Nevertheless, Mr. Vigeant, the Director of Special Education, scheduled another IEP meeting to be held on August 17, 2007 (the "8/17/07 meeting"). Decision at 23. Ms. Paquette, his secretary, testified that she typed the letter, dated August 8, 2007 (the "8/8/07 Letter"), scheduling the IEP meeting, gave it to Mr. Vigeant to sign, and mailed the letter. Tr. Vol. VI at 88-89. She further testified that on August 17th she received a telephone call from someone identifying herself as C.G.'s parent. Id. at 86. She took a message and typed a memorandum for C.G.'s

student file.  Id. at 86-88.  The memorandum stated:

> On August 17, 2007, parent called to let us know that
> husband was called in to work and could not attend the
> meeting that was scheduled on this day but she would like
> to tour the school.  I gave her the high school to call
> Brian Dillon and let him know what she would like to do.

Defendants' Hearing Ex. D-8 (Memorandum for C.G.'s file regarding

cancellation of 8/17/07 meeting); see also Tr. Vol. VI at 86-88.

Although Plaintiff testified that she never received the

8/8/07 Letter, Tr. Vol. V at 54; see also Decision at 24, and

that she did not call to cancel the 8/17/07 meeting, Tr. Vol. V

at 55, the Hearing Officer found "entirely credible[] the

testimony of Ms[.] Paquette, the School Clerk, regarding the

notice of the 8/17/07 meeting, as well as the report of the phone

call cancelling the meeting.  This [District] staff member[] had

nothing to gain (or lose) from her testimony," Decision at 25

(internal citation omitted).  Her credibility findings are

entitled to deference.  Cranston Sch. Dist. v. Q.D., C.A. No. 06-

538ML, 2008 WL 4145980, at *9 (D.R.I. Sept. 8, 2008)("As the

fact-finder, [the Hearing Officer's] credibility findings from

the Hearing should be given deference.")(citing Lenn v. Portland

Sch. Comm., 998 F.2d 1083, 1087 (1st Cir. 1993)); Slater v.

Exeter-W. Greenwich Reg'l Sch. Dist., No. CA 06-527 ML, 2007 WL

2067719, at *9 (D.R.I. July 16, 2007) ("The Hearing Officer's

interpretation of this evidence and credibility determination is

entitled to deference ....").

Lending further credence to the Hearing Officer's credibility determination is the fact that Plaintiff sent a letter, dated August 17, 2007 (the "8/17/07 Letter"), to Mr. Vigeant informing him that she did not accept the recommended placement of C.G. at WWHS or the alternative Civic Center program. Plaintiff's Hearing Ex. P-18. Plaintiff further stated that she was "removing [C.G.] from the West Warwick Public Schools ... [and] intend[ed] to locate an appropriate private school program for [C.G.] at the expense of the West Warwick Public Schools." Id.; cf. Slater v. Exeter-W. Greenwich Req'l Sch. Dist., 2007 WL 2067719, at *9 (quoting United States v. Espinoza, 490 F.3d 41, 46 (1st Cir. 2007)("'when two or more legitimate interpretations of the evidence exist, the factfinder's choice between them cannot be deemed clearly erroneous' and thus the factfinder's choice of 'a reasonable (though not inevitable) inference from a particular combination of facts ... is entitled to deference'"))(alteration in original); see also David G. v. Council Rock Sch. Dist., Civil Action No. 06-1523, 2009 WL 3064732, at *4 (E.D. Pa. Apr. 7, 2009)("If the Hearing Officer has heard live testimony and has found the testimony of one witness to be more worthy of belief than the contradictory testimony of another witness, that determination is due 'special weight.' '[T]his means that a District Court must accept the [Hearing Officer]'s credibility

determinations unless the nontestimonial, extrinsic evidence in
the record would *justify* a contrary conclusion.")(quoting L.E. v.
Ramsey, 435 F.3d 384, 389 (3rd Cir. 2006)(emphasis in original))
(alterations in original).

Although Plaintiff argues that the Hearing Officer in
finding that Plaintiff obstructed the IEP process "failed to
follow the directive of C.G. and B.S. v. Five Town Community Sch.
Dist., 513 F.3d 279 (1st Cir. 2007)," Plaintiff's Reply
Memorandum of Law in Opposition to Defendants' Motion for Summary
Judgment and in Support of Plaintiffs' [sic] Motion for Summary
Judgment (Dkt. #27) ("Plaintiff's Reply") at 2, in that the Five
Town court held that the Hearing Officer's "review should have
been conducted for issues such as the way in which the IEP
process unfolded and relative responsibilities of the
participants for the breakdown of the process,[10] by looking at
the totality of the circumstances, considering extrinsic evidence
if necessary[,] and judging parent's claims accordingly," id.
The Court disagrees.  The Hearing Officer cited the Five Town

_____

[10] As an example, Plaintiff states that when she "and her
representatives at the June, 2007 IEP meeting wanted to discuss
placement for C.G., the [District] representative, Mr. Dillon, refused
to consider it at that time, saying he wanted to review the DAS report
which had been available prior to the meeting, but which he claimed
not to have read."  Plaintiff's Reply Memorandum of Law in Opposition
to Defendants' Motion for Summary Judgment and in Support of
Plaintiff's Motion for Summary Judgment (Dkt. #27) ("Plaintiff's
Reply") at 2-3.  The minutes of the 6/1/07 make clear that the DAS
Report had just been made available to the IEP team, see Plaintiff's
Hearing Ex. P-14 at 2, and that Mr. Dillon wanted to be able to review
it before making a placement determination, see id.

case in her Decision, see Decision at 24-25, after a painstaking review of the circumstances which led her to conclude that Plaintiff was responsible for the breakdown of the process, see id. at 16-25.  It is clear from looking at the totality of the circumstances that the Hearing Officer's finding that Plaintiff obstructed the IEP process is supported by a preponderance of the evidence and should be affirmed.  I so recommend.

### 2. Whether West Warwick Offered C.G. FAPE

The Hearing Officer found that West Warwick "did offer the Student a FAPE, though the IEP was incomplete and could not be completed after the Parent withdrew the Student from the West Warwick School District."  Decision at 25.  Plaintiff argues that West Warwick failed to provide C.G. with FAPE for the 2007-08 and 2008-09 school years.[11]  See Plaintiff's Reply at 4.  Plaintiff's complaints appear to revolve around two issues: the incompleteness of the 6/6/07 IEP and her inability to view the Civic Center program because it was not yet in existence.

The Hearing Officer explicitly found that the 6/6/07 IEP was

---

[11] Plaintiff also appears to challenge the 2/14/07 IEP and 5/14/07 IEP.  See generally Memorandum of Law in Opposition to Defendant West Warwick's Motion for Summary Judgment and in Support of Plaintiff's Motion for Summary Judgment (Dkt. #13) ("Plaintiff's Mem."); see also id. at 8-9 (noting lack of counseling and physical education in the alternative after school program).  However, Plaintiff signed both the 2/14/07 IEP and the 5/14/07 IEP, see Plaintiff's Hearing Ex. P-10 at 7; Plaintiff's Hearing Ex. P-13 at 7, and, as the Hearing Officer noted, she never revoked her consent for the after school program, Decision at 20.

incomplete.  See Decision at 25.  West Warwick does not dispute
that the 6/6/07 IEP was incomplete.  See West Warwick's
Memorandum of Law in Support of Its Motion for Summary Judgment
("West Warwick's Mem.") at 21 ("West Warwick does not dispute
[Plaintiff]'s contention that the June 6, 2007, IEP was never
finished.").  Although Plaintiff complains that C.G.'s "IEP team
never met to finalize the 2007-08 IEP," Plaintiff's Mem. at 12,
that is because Plaintiff cancelled the scheduled 8/17/07
meeting, see Discussion section V. B. 1. c. supra at 28-29.
Further, despite Mr. Vigeant's testimony that he did not attempt
to discuss Plaintiff's unilateral placement of C.G. at Tides in
an IEP review meeting after receiving the 8/17/07 letter, Tr.
Vol. IV at 129, his 9/14/07 Letter to Plaintiff did, in fact,
suggest that Plaintiff should contact him if she wished to
schedule another IEP meeting, see Plaintiff's Hearing Ex. P-19
("Please contact me if you wish to set up an IEP team meeting.").
She did not.  See Tr. Vol. X at 153.

     In MM v. School District of Greenville County, 303 F.3d 523
(4th Cir. 2002), the Court of Appeals for the Fourth Circuit
addressed a similar complaint that a school district's failure to
complete a student's IEP entitled the parents to reimbursement,
see id. at 534.  The Fourth Circuit stated that:

     [T]he [district] court properly concluded that "it would
     be improper to hold [the] School District liable for the
     procedural violation of failing to have the IEP completed
     and signed, when that failure was the result of [the

> parents'] lack of cooperation.
>
> It is significant that there is no evidence that MM's parents would have accepted any FAPE offered by the District that did not include reimbursement for the Lovaas program. As we have noted, the District is not obligated by the IDEA to provide a disabled child with an optimal education; it is only obliged to provide a FAPE. ...

Id. at 535; see also Lessard v. Wilton-Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 26 (1st Cir. 2008)(quoting MM v. Sch. Dist. of Greenville Cnty., 303 F.3d at 535). Similarly, the Hearing Officer in the instant matter found that C.G.'s IEP "could not be completed after the Parent withdrew the Student from the West Warwick School District." Decision at 25. Plaintiff cannot now complain about the inadequacy of an IEP the completion of which she prevented.

Here, despite the fact that the 6/6/07 IEP was incomplete, the Hearing Officer found that West Warwick offered C.G. FAPE at the Civic Center program. See id. Plaintiff argues that "she could not see it in operation," Plaintiff's Mem. at 4; see also id. at 7, and, therefore, "had no basis for determining the appropriateness of that setting ...," id. at 7. However, had she attended the 8/17/07 meeting, she would have been able to learn more about the Civic Center program, as the staff from the Civic Center program would have been in attendance, see Decision at 23-24, 26; see also Tr. Vol. IV at 109 ("We scheduled that IEP meeting. We specifically brought in the individuals who would be

working at the [Civic Center] program because Mr. Dillon felt it was important to have those people present at the IEP meeting. So I authorized them to come in."); cf. Scituate Sch. Comm. v. Robert B, 620 F.Supp. 1224, 1234 (D.R.I. 1985)("Though the B's point to the fact that Scituate's self-contained classroom had been instituted only one year earlier as an indication of the inadequacy of the program, the age of the self-contained classroom bears no relationship to the effectiveness of the program.").

Mr. Vigeant testified that he believed West Warwick could have provided C.G. with FAPE at the Civic Center program. Tr. Vol. X at 154. He stated that there were two special education teachers hired for the Civic Center program as well as a clinician and an assistant special education director, none of whom had any prior contact with C.G. See id. at 149. Mr. Vigeant described the program as follows:

> The [Civic Center] program was established for students
> with significant behavioral and emotional issues. We
> invested a great deal in putting together a solid
> program. We completely renovated the facility with
> equipment and technology that would allow students to,
> you know, to benefit from the education we were providing
> them there. We had a careful selection process in terms
> of hiring individuals that we thought could move kids
> forward. We hired a very competent experienced
> administrator. In addition to that, we had a job coach.
> We were very careful about ensuring that students who
> couldn't have access or shouldn't have access to the high
> school were separate and apart. The phys. ed. was held
> at the YMCA in Warwick, that was for those students that
> needed to be separate and apart, it was separate and
> apart for them based on their individual educational

> programs.  The clinical services were/are top-notch, Mrs.
> Grant is an outstanding clinician.

Id. at 154-55.  He concluded by stating that "there's no doubt in

my mind that we could have and can still service [C.G.] at the

[Civic Center] program."  Id. at 155.  Even Plaintiff's expert,

Dr. Dineen, allowed that the Civic Center program, which was

described to her as a program for students with needs similar to

C.G.'s, in a separate structure, with no interaction with the

rest of WWHS, and supported by two teachers, a full-time

administrator, and a clinical social worker, would "seem

appropriate" for C.G.  Tr. Vol. X at 82-83.

Although more restrictive than C.G.'s prior placement, see

Decision at 28, the Hearing Officer found that the Civic Center

placement was an appropriate placement in the least restrictive

environment to meet C.G.'s diagnosed needs, id. at 28, 31; see

also Scituate Sch. Comm. v. Robert B, 620 F.Supp. at 1227 (noting

that court "may properly consider the opinions of the state and

local hearing officers, especially in making factual

determinations requiring specialized knowledge"); cf. Roland M.

v. Concord Sch. Comm., 910 F.2d at 992 (noting that "the alchemy

of 'reasonable calculation' necessarily involves choices among

educational policies and theories–choices which courts,

relatively speaking, are poorly equipped to make").  Plaintiff

argues that West Warwick described the Civic Center program first

as a day school and subsequently as a self-contained program, see

Plaintiff's Mem. at 25-26, an argument the Hearing Officer rightly rejected, see Tr. Vol. IV at 141-46. According to Plaintiff, Mr. Dillon, who "ha[d] the authority to commit these resources ...," id. at 27; see also R.I. Regs. § 300.321(a)(4), recommended placement in a day school (the fourth placement option on the continuum) as opposed to a self-contained program in a school building (the second option on the continuum), see Plaintiff's Mem. at 27.[12]  Plaintiff implies that, as a result,

---

[12] R.I. Regs. § 300.115(A) reads as follows:

*General*.  Each public agency shall make available to children with disabilities the following continuum of special education programs:

(1) Placement of the child in a general education classroom with special education consultation, supplementary aids and services or part-time services in a special class.  The special educator(s) shall consult with the child's parent and general education teachers.
(2) Placement in a special class integrated in a school district building.  Placement must be based on similarity of student strengths and needs for the purpose of ensuring academic achievement and functional performance.  Such classes must be taught by a special education teacher, together with other appropriately certified specialists providing related services.  These professionals shall also consult with the child's parents.
(3) Home or hospital instruction provided by special education teachers, general education classroom teachers or regular education, subject-matter teachers, together with other appropriately certified specialists providing related services, as needed; to any child with a disability whose health status warrants home or hospital instruction.
(4) Special education day school placement in a separate public school or non-public facility whose special education program has been approved by the Rhode Island Commissioner of Elementary and Secondary Education.
(5) Special education residential school placement in a separate public or non-public facility whose special education program has been approved by the Rhode Island Commissioner of Elementary and Secondary Education.
(6) A continuum of services must be available to enable each

the Civic Center program did not represent the least restrictive environment.  Plaintiff appears to be comparing the Civic Center program to the Coventry program which she desired.  However, C.G. did not enroll at Coventry; she was placed at the Tides School, which the Hearing Officer found to be more restrictive than the Civic Center program, see Decision at 30.

Moreover, West Warwick had already tried the first two options on the contintuum.  The 5/1/06 IEP had provided for C.G. to remain in a regular classroom with access to the Social Intervention Resource Program, with extra time to complete assignments, the ability to take tests and quizzes and complete assignments in the resource room, and supervision by a special education teacher.  See Plaintiff's Hearing Ex. P-6.  Both the 2/14/07 IEP and 5/17/07 IEP called for C.G. to be placed in an alternative after school program within WWHS.  See Plaintiff's Hearing Ex. P-10; Plaintiff's Hearing Ex. P-13.  Thus, whether the Civic Center program was described as a day school program or a self-contained program, it was the next logical step in order to provide FAPE to C.G.

Plaintiff contends that:

Attendance at school has significantly improved for C.G.

---

child ages fourteen (14) to twenty one (21) or earlier if appropriate, or upon graduation with a regular high school diploma, to achieve his or her measurable post-secondary goals ....

R.I. Regs. § 300.115(A).

over what it had been at West Warwick. She is receiving
direct instruction for a full day school as opposed to a
two-hour after-school tutorial program which had been in
effect for her in 2006-2007. She is receiving necessary
individual and group counseling as part of her program
which was non-existent in the West Warwick program. She
is completing assignments and progressing reasonably
well, as indicated by her report card. She has access to
core subjects as well as physical education, health and
art, unlike at West Warwick where she had no physical
education and itinerant subjects (art, music, etc.).

Plaintiff's Mem. at 18. However, Plaintiff is comparing C.G.'s

program at Tides to her placement under the 2/17/07 IEP and

5/17/07 IEP, not the Civic Center program contained in the 6/6/07

IEP. Moreover, the First Circuit has rejected the argument that

because a student is doing better in a private placement, the

public school placement must be inadequate. See Amann v. Stow

Sch. Sys., 982 F.2d 644, 649-50 (1st Cir. 1992)(citing Roland M.

v. Concord Sch. Comm., 910 F.2d at 992). In Slater v. Exeter-

West Greenwich Regional School District, this Court addressed a

similar situation in which parents were not satisfied with a

proposed IEP for their son and placed him in a private school:

Since Bobby never attended the middle school for seventh
grade, no one can state with any level of certainty
whether Bobby's transition would have been successful or
unsuccessful. The Hearing Officer certainly did not have
a crystal ball enabling her to see into the future, and
she was forced to weigh competing opinions on the topic.
The Slaters had to make a similar "blind" decision, and
were ultimately of the opinion that the Wolf School was
a better placement for Bobby. While the Slaters may well
be correct about the Wolf School, the issue before the
Hearing Officer was not whether the Wolf School was
better than the District. The issue was whether the
District's proposed seventh-grade IEP would have provided
Bobby with FAPE. The Slaters have not met their burden

39

> of establishing that the Hearing Officer erroneously
> decided this issue in favor of the District. Thus, the
> Hearing Officer's decision as to FAPE must be affirmed.

Id. at *7; see also id. at *4 ("[A] FAPE may not be the *only* appropriate choice, or the choice of certain selected experts, or the child's parents' *first* choice, or even the *best* choice.") (alteration in original); Shaw v. Dist. of Columbia, 238 F.Supp.2d at 139; Brougham v. Town of Yarmouth, 823 F.Supp. at 16. Such is the case here. Whether or not Plaintiff had the opportunity to compare the Civic Center program to the Tides School program is not the issue. What is at issue is whether West Warwick offered C.G. a FAPE.

Given that "courts should recognize the expertise of educators with respect to efficacy of educational programs," C.G. v. Five Town Cmty. Sch. Dist., 513 F.3d at 289 (citing Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley, 458 U.S. at 207-08), this Court cannot find that the Hearing Officer erred in deciding to accept the opinions of the educators that the Civic Center program offered C.G. FAPE. Accordingly, her finding that West Warwick offered FAPE should be affirmed. I so recommend.

### 3.   Whether any alleged procedural errors resulted in a denial of FAPE

Among the procedural violations which Plaintiff argued

before the Hearing Officer,[13] and argues before this Court, is "the failure of the district to make a formal, written offer of placement in compliance with IDEA's procedural requirements." Plaintiff's Mem. at 7 (citing Union Sch. Dist. v. Smith, 15 F.3d 1519, 1526 (9th Cir. 1994)). Plaintiff faults West Warwick for failing to have an IEP in place for C.G. "until more than two (2) weeks of the school year had elapsed." Id.

As discussed previously, Mr. Vigeant scheduled the 8/17/07 meeting in order to complete C.G.'s IEP. The Hearing Officer found that Plaintiff cancelled said meeting, and her finding is entitled to deference. See Cranston Sch. Dist. v. Q.D., 2008 WL 4145980, at *9; Slater v. Exeter-W. Greenwich Reg'l Sch. Dist., 2007 WL 2067719, at *9; see also David G. v. Council Rock Sch. Dist., 2009 WL 3064732, at *4. Mr. Vigeant subsequently received Plaintiff's 8/17/07 Letter, in which she stated that she "d[id] not accept the recommended placement of [C.G.] at West Warwick High School or the alternative placement you suggested at the (adjacent) civic center program," Plaintiff's Hearing Ex. P-18, and that she was "removing [C.G.] from the West Warwick Public

---

[13] Plaintiff raised numerous procedural issues in the due process hearing, which the Hearing Officer found had no merit or were harmless. See Decision at 25-29. Most of these procedural issues are poorly developed before this Court and are, therefore, viewed as waived. See Amann v. Stow Sch. Sys., 982 F.2d 644, 651 (1st Cir. 1992) (noting that plaintiffs' brief treated only five procedural issues in detail and limited discussion to those issues); see also United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Schools ...," id.  Mr. Vigeant responded with a letter which
advised Plaintiff that the placement listed in the 6/6/07 IEP,
the Civic Center program, "addresses [C.G.]'s need for an
alternative placement in the least restrictive environment."
Plaintiff's Hearing Ex. P-19.  He further noted that both the
Civic Center program and the Tides school "draw[] students from
the same community ...," id., and, thus, Plaintiff's unilateral
placement of C.G. at the Tides School did not "address the
concern that you raised in [the 8/17/07 Letter]," id., i.e.,
C.G.'s discomfort "attending the West Warwick Public Schools
...," Plaintiff's Hearing Ex. P-18.  Mr. Vigeant invited
Plaintiff to contact him if she wished to schedule an IEP team
meeting.  Plaintiff's Hearing Ex. P-19.  She failed to do so.
See Tr. Vol. X at 153.  Thus, again, the failure to complete
C.G.'s IEP in a timely fashion rests with Plaintiff, not with
West Warwick.  See MM v. Sch. Dist. of Greenville Cnty., 303 F.3d
 at 534; cf. Lessard v. Wilton-Lyndeborough Coop. Sch. Dist., 518
F.3d at 26 ("Consequently, a parent's obstruction of the IEP
process, caused by his or her unreasonable delay in acting upon a
completed IEP, can relieve a school system from its obligation to
have an assented-to IEP in place at the start of the school
year.").

Plaintiff also argues that West Warwick predetermined C.G.'s
placement in the Civic Center program because:

That setting had not been discussed by the IEP team prior
to the June 6, 2007[,] meeting, yet it was included in
the IEP which was handed out by West Warwick at the start
of that meeting. Coupled with the fact that [Plaintiff]
was not able to get the letter of introduction from the
West Warwick administration to see Tollgate High School
and Coventry High School programs,[14] which had been
agreed to at the May 14, 2007[,] IEP meeting, there was
good reason for [Plaintiff] to believe that West Warwick
had already made a placement decision for C.G. before the
June 6, 2007[,] meeting ever took place.

Plaintiff's Mem. at 7-8 (internal citations omitted); see also
id. at 14 (noting "the attempt by West Warwick to predetermine a
placement for C.G. in the Civic Center day school program"). The
Hearing Officer found otherwise. See Decision at 28-29.

Specifically, the Hearing Officer stated that West Warwick's
"IEP Team were waiting for the DAS Report results and considered
and used them in making the offer of a placement in the Civic
Center program, where they determined that her diagnosed needs
could be met." Decision at 29; see also id. at 22-23
(summarizing 6/6/07 meeting). The Hearing Officer further stated
that "the IEP for the 2007-08 School Year was incomplete,"
Decision at 23, and that another meeting was scheduled for
8/17/07 for that reason, see id. The Court agrees.

"It is nose-on-the-face plain from even a cursory inspection
... that the IEP was not intended to constitute a completed IEP."

_____

[14] Plaintiff did, in fact, visit the Coventry program, as
confirmed by the minutes of the 6/1/07 meeting. See Plaintiff's
Hearing Ex. P-14 at 2("Mom — went to Coventry [self-contained] life
skills program — "very satisfied" w[ith] it."); id. ("Mom really liked
the program at C[oventry] H.S."); see also Tr. Vol. V at 36; Tr. Vol.
IX at 78.

C.G. v. Five Town Cmty. Sch. Dist., 513 F.3d at 283; cf. Scituate Sch. Comm. v. Robert B., 620 F.Supp. at 1231 ("The mere fact that the school came to the meeting with a document that was entitled Independent Education Program and was dated to take effect immediately does not invalidate the IEP meeting ... or the product of that meeting."); id. (noting that "it is appropriate for agency staff to come prepared with evaluation findings, statements of present levels of educational performance, and a recommendation regarding: annual goals, short term instructional objectives, and the kind of special education and related services to be provided")(internal quotation marks omitted). For example, the "Alternative Day School Program," Plaintiff's Hearing Ex. P-17 at 4, placement is handwritten, directly under the typewritten "alternative interim," id., placement, which was C.G.'s placement at that time.

The minutes of the 6/1/07 meeting note that Mr. Dillon "want[ed] conclusive data, paperwork to review data - aside from simple diagnosis of Depression - before placement considerations." Plaintiff's Hearing Ex. P-14 at 2. The minutes of the 6/6/07 meeting reflect that there was a discussion of placement "options," Plaintiff's Hearing Ex. P-16 at 2, specifically the Coventry program and the Civic Center program, id.; see also Plaintiff's Hearing Ex. P-15 at 1 (noting that Mr. Dillon "[i]ntroduced program at Civic Center including clinical

services — self-contained — low ratio — **open to discussion**,
outside of school building")(bold added).  There is no indication
in the minutes of either the 6/1/07 meeting or the 6/6/07 meeting
that C.G.'s placement had been determined.  What is clear is
Plaintiff had made up her mind regarding C.G.'s placement.  See
Plaintiff's Hearing Ex. P-15 at 1 (noting that Mr. Capalbo was
"still in agreement w[ith] placement for Coventry H.S.—Tides,
Mom, DCYF want a different setting").

The Court concludes that the Hearing Officer's finding that
there were "no fatal flaws that would have resulted in a denial
of FAPE for the Student," Decision at 29, is supported by a
preponderance of the evidence.  Accordingly, her findings
regarding procedural issues should be affirmed.  I so recommend.

**4.    Whether West Warwick was obligated to develop an IEP
for C.G. for the 2008-09 school year**

Plaintiff argues that "[e]ven if the 2007-08 IEP was deemed
appropriate for C.G., which C.G. vehemently disputes, it
certainly does not apply for the 2008-09 school year.  Issues
such as related services, transportation, special education
services, and placement all need to be considered on an annual
basis, and in place at the start of each school year."
Plaintiff's Mem. at 30 (internal citations omitted).  Plaintiff
further argues that "[t]he case cited by [D]efendants in their
supplemental briefs, Amann v. Stow Sch. Sys., 982 F.2d 644 ([1st
Cir.] 1992), is clearly not applicable to this matter in view of

the RI Regs. § 300.129 III-V in effect at the time." The Court disagrees.

The Court initially notes that Plaintiff failed to cooperate in the collaborative process by cancelling the 8/17/07 meeting and unilaterally placing C.G. at the Tides School. The Court also rejects Plaintiff's contention that Amann does not apply to the instant matter. The Court is unpersuaded that the R.I. Regs. require the District to go through the wasteful effort of attempting to conduct an IEP meeting and prepare an IEP for a student whose parent has unilaterally withdrawn her from the District and whose parent has failed to respond to an overture from the District to convene an IEP meeting.

In Amann v. Stow School System, the First Circuit stated that:

> [F]ederal regulations promulgated under the IDEA ... say that public officials need develop[] and implement[] an IEP for a child in private school only if the child was placed in or referred to [the] private school or facility *by a public agency*.
>
> By December 1987, when the 1986 IEP would have come up for its annual review, Christopher had enrolled at Carroll School. He was not placed there by a public agency; his parents enrolled him unilaterally, without challenging the IEP or obtaining Stow's consent to the transfer. According to regulation, their action relieved the Town of its responsibility to develop and implement an IEP for Christopher, and if Stow was not required to *create* an IEP for Christopher, then it follows that the Town had no obligation to review or revise the IEP already in place.

982 F.2d at 651 (third, fourth, and fifth alterations in

original)(internal citation and quotation marks omitted).  The
First Circuit in <u>Amann</u> reconciled its holding with its prior
decision in <u>Town of Burlington v. Department of Education for</u>
<u>Massachusetts</u>, 736 F.2d 773 (1st Cir. 1984), by further stating
that:

> The pendency of review, not the placement in private
> school, creates the need to maintain and update the IEP.
> Because the Amanns did not complain formally about the
> IEP, or invoke their right to a ... hearing concerning
> its adequacy, there was no administrative or judicial
> review pending between September 1987 and January 1989,
> and hence no obligation to review and revise.

982 F.2d at 651 n.4; <u>see also</u> <u>MM v. Sch. Dist. of Greenville</u>
<u>Cnty.</u>, 303 F.3d 523, 536 (4th Cir. 2002)(citing <u>Amann v. Stow</u>
<u>Sch. Sys.</u>, 982 F.2d at 651 n.4, for proposition that "[a] school
district is only required to continue developing IEPs for a
disabled child no longer attending its schools when a prior
year's IEP is under administrative or judicial review").

Here, Plaintiff withdrew C.G. from WWHS in August of 2007.
<u>See</u> Plaintiff's Hearing Ex. P-18.  She did not, however, file her
request for a due process hearing until January of 2009.  <u>See</u>
Decision at 6.  Thus, at the start of the 2008-09 school year, no
administrative or judicial review was ongoing, thereby relieving
West Warwick of the responsibility of formulating an IEP for C.G.
Accordingly, Plaintiff's argument to the contrary should be
rejected.  I so recommend.

**5. Whether West Warwick is obligated to reimburse Parent for her unilateral placement of C.G. in private school**

Finally, Plaintiff contends that West Warwick's "[failure to prepare an adequate IEP ... and the inappropriateness of the district's proposed placement entitled [] parent to reimbursement of private school tuition."  Plaintiff's Mem. at 11 (citing Evanston-Skokie Cmty. Consol. Sch. Dist. No. 65, 17 IDEAL 1072 (SEA, IL 1991).  This Court has stated that:

> When parents unilaterally place their child in a private school ... they are entitled to reimbursement 'only if a federal court concludes both that the public placement violated the IDEA and that the private school placement was proper under the [IDEA].  Florence County ch. Dist. Four v. Carter, 510 U.S. 7, 15 (1993)(emphasis in original).  While the Slaters had every right to enroll Bobby at the Wolf School while they challenged the District's IEP, they acted at their own 'financial risk' in doing so.  Michael C. v. Radnor Township Sch. Dist., 202 F.3d 642, 651 (3rd Cir. 2000); see also [R.I.] Regulation § 300.403. ...

Slater v. Exeter-W. Greenwich Reg'l Sch. Dist., 2007 WL 2067719, at *3; see also C.G. v. Five Town Cmty. Sch. Dist., 513 F.3d at 289 ("Although reimbursement of parental expenses for private ... placements is sometimes available under the IDEA, such reimbursement is contingent upon a showing that the parents diligently pursued the provision of appropriate services from the public school system, yet the school system failed to provide those services; and that the private placement is a suitable alternative.").  Because the Court finds that West Warwick's proposed placement of C.G. in the Civic Center program did not

violate the IDEA, the Court need not address the second factor, whether Plaintiff's unilateral placement of C.G. at the Tides School was proper.  See id.

Here, as was the case in C.G. v. Five Town Community School District, "[t]he parents made a unilateral choice to abandon the collaborative process without allowing that process to run its course.  Thus, the parents are precluded from obtaining reimbursement for the costs of the [private] school placement ...."  513 F.3d at 289-90; see also id. at 288 ("Their unreasonable obstruction of an otherwise promising IEP process justifies a denial of reimbursement under the IDEA."); Brougham v. Town of Yarmouth, 823 F.Supp. at 18 ("In the case at bar, Mrs. Brougham removed Travis from Yarmouth schools and placed him at Clarke in the fall of 1991, without consent from Yarmouth school officials, and while the appeal of the proposed IEP was pending. Because this Court holds that the proposed IEP constitutes a free appropriate education under the IDEA, the cost of Mrs. Brougham's unilateral placement at the Clarke School must be borne by Mrs. Brougham.").  Plaintiff, therefore, is not entitled to reimbursement for her unilateral placement of C.G. at the Tides School.  Plaintiff's contrary contention should be rejected.  I so recommend.

VI.  **Summary**

The Court finds that the Hearing Officer's decision is

supported by a preponderance of the evidence.  I therefore recommend that Defendant's Motion for Summary Judgment be granted and that Plaintiff's Motion for Summary Judgment be denied.

## VII.  Conclusion

For the reasons stated above, I recommend that Defendants' Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.  Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt.  See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision.  See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
December 30, 2010